IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIGUEL MOLINA | : | CIVIL ACTION |
| Plaintiff, | : | NO. 12-5824 |
| v. | : | |
| MICHEL WENEROWICZ, et al., | : | |
| Defendants. | : | |

**Jones, II   J.**                                                                                   November 21, 2016

## MEMORANDUM

State prisoner Miguel Molina brought this *pro se* action against various officials of the State Correctional Institution at Graterford and the Pennsylvania Department of Corrections (PDC) pursuant to 42 U.S.C. § 1983, alleging violations of the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.  Compl. ¶¶ 57-63, ECF No. 3.  Specifically, the plaintiff claims discrimination, retaliation, inhumane conditions and denials of due process and access-to-courts.  *Id*.

The Complaint names the following defendants: Michael Wenerowicz (superintendent/facility manager of SCI-Graterford), George Ondrejka (deputy superintendent of internal security at SCI-Graterford), Francis Field (major of the PDC assigned to SCI-Graterford), Thomas Bolton (unit manager of the PDC assigned to SCI-Graterford), William Radle (lieutenant of the PDC assigned to SCI-Graterford), Gerald Kelly (counselor of the PDC assigned to SCI-Graterford), and Mary Canino (hearing examiner of the PDC assigned to SCI-Graterford) (collectively, "Defendants").  *Id*. ¶¶ 4-10.

1

Before this Court is Defendants' Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. ECF No. 8. This Court grants the Motion, in part, and denies it, in part, for the reasons set forth in this memorandum.

## PROCEDURAL BACKGROUND

Molina filed the Complaint on October 19, 2012, seeking damages under Section 1983 and requesting declaratory and injunctive relief. Compl. ¶¶ 1, 57- 66. The Complaint includes multiple exhibits and two sworn declarations from two other inmates, Ivan Hill and Harvey Miguel Robinson. *See* Compl., Exhibits A-D-3 at 21-46. On December 24, Defendants filed the Rule 12(b)(6) Motion that is the subject of this memorandum. ECF No. 8. In the interim, Molina filed a motion seeking substantially the same injunctive relief requested in the Complaint. ECF No. 6. He also filed motions to appoint counsel and compel discovery. ECF Nos. 12 and 20. This Court referred the motions for discovery, injunctive relief, and appointment of counsel to Magistrate Judge Lynne Sitarski. On April 23, 2014, Judge Sitarski denied the discovery motion and the motion for appointment of counsel without prejudice as premature. ECF No. 27. That same day, Judge Sitarski issued a Report and Recommendation addressing and recommending denial of the plaintiff's requests for injunctive and declaratory relief. R&R, ECF No. 28. The plaintiff did not object to the R&R, and this Court approved and adopted it on May 13, 2014. ECF No. 29. This Court now resolves Defendants' 12(b)(6) Motion to dismiss the Section 1983 claims.

## STANDARD OF REVIEW

In deciding a Rule 12(b)(6) motion, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v.*

*County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted). When, as here, the plaintiff is a *pro se* litigant, courts "have a special obligation to construe his complaint liberally." *Zilich v. Lucht*, 981 F.2d 694 (3d Cir. 1992) (citing to *Haines v. Kerner,* 404 U.S. 519, 520 (1972)). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[A]ll civil complaints must now set out sufficient factual matter to show that the claim is facially plausible." *Fowler*, 578 F.3d at 210 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Courts may also consider documents attached to the complaint in deciding a 12(b)(6) motion. *See Huertas v. Galaxy Asset Mgmt.,* 641 F.3d 28, 32 (3d Cir. 2011).

### FACTUAL ALLEGATIONS

The plaintiff claims he was subjected to discrimination, retaliation and inhumane conditions while confined in SCI-Graterford's Restricted Housing Unit (RHU).

#### A. Discriminatory and Retaliatory Treatment

According to the Complaint, Defendants conspired and agreed, via e-mail and telephonic communications, to issue false misconduct reports as a pretext to confine Molina in the RHU for discriminatory and retaliatory reasons. Compl. ¶ 31.

Molina has been imprisoned at SCI-Graterford since February 2006. *Id*. ¶ 23. On July 16, 2011, he was removed from the prison's general population and placed in the RHU. *Id*.

¶ 11.  On or about July 31, Lt. Radle issued a "fabricated" misconduct report charging Molina with violating three institutional rules pertaining to the possession of contraband, specifically a cell phone.  *Id*. ¶¶ 12, 35.  On August 8, Canino held a disciplinary hearing in which she dismissed two of the charges, but found Molina guilty of the third charge without producing any evidence or a written statement of factual findings.  *Id*. ¶¶ 13-15, 35, 42-45.  Canino disciplined Molina with 90 days in the RHU and terminated his prison job.  *Id*. ¶¶ 13, 35.  The Program Review Committee (PRC), Wenerowicz and the Chief Hearing Examiner denied Molina's administrative appeals in which he claimed due process violations in his disciplinary hearing.  *Id*. ¶¶ 13, 36-38.  Wenerowicz also failed to conduct a minimal investigation and provide any evidence for his decision during his review of the administrative appeals.  *Id*. ¶ 41.

On March 9, 2012, Molina's time in disciplinary custody expired, and he became eligible for release into the general population.  *Id*. ¶ 22. On and around that date, Kelly and Field issued "false and fabricated" misconduct reports, placing Molina on administrative custody under the "pretext" that he was a security threat, had smuggled drugs and was awaiting transfer.  *Id*. ¶¶ 20, 22.  *See also id.*, Exhibit B at 24 (Kelly's report), Exhibit A at 22 (Field's report).  Thereafter, Field and Bolton issued more "false and fabricated" reports, extending Molina's time in administrative custody on the basis that he was involved in gang activity, was in possession of a cell phone and was threatening to escape.  *Id*. ¶¶ 24-28.  *See also id*., Exhibit D at 25 *and* Exhibit D-3 at 32 (Field's reports), Exhibit D-3 at 35 (Bolton's report).

The plaintiff also began experiencing other forms of retaliation, such as cell searches and denial of privileges without cause, *after* submitting various grievances and complaints against Field, Bolton, Wenerowicz, Ondrejka, Kelly and Lt. Radle.  *Id*. ¶¶ 18, 31.  As early as November 28, 2011, Molina had prepared legal documents naming Wenerowicz.  *Id*. ¶

4

19.  Those "civil documents" were confiscated by the prison's law librarian the same day. *Id*. On February 16, 2012, Molina filed a grievance against Kelly for "racial discrimination" in connection with Molina's request to purchase a phone card to contact his attorney in his capital case. *Id*., Exhibit D-3 at 38.  The morning of February 27, Molina's co-inmates, Hill and Robinson, overheard an exchange between Kelly and Molina, in which Kelly stated: "You like filing petitions, complaints, and grievances?  If you don't withdraw, I'll make sure when you see PRC, you get nothing, and I'll make sure you get transferred." *Id*., Exhibits D-3 at 39, 40. According to Robinson, on March 5, Kelly told Molina that "as long as he (Molina) had a civil suit against him (Kelly), that (Molina) . . . will never receive any privileges." *Id*., Exhibit D-3 at 40.  Kelly continued, "Withdraw that grievance and take my name out that law suit and I'll make sure that you get your TV and radio – just like the other pending capital cases.  If not, then you'll get [nothing] and I'll make it bad for you and you'll think your (*sic*) stranded in your Puerto Rican country." *Id*. (brackets supplied).  Kelly then "started mocking the way Spanish people talk," and stated, "He's a stupid spic putting grievances and law suits against me." *Id*.  On March 13, Molina submitted an inmate request to Wenerowicz, explaining that he had withdrawn his habeas petition from the Montgomery Courthouse because Kelly had threatened to transfer him unless he withdrew all the complaints he filed against Kelly and the PDC. *Id*., Exhibit D-3 at 41.

        In addition to having his legal documents confiscated by the law librarian, Molina was also denied access to legal materials that he needed to prepare "for his cases which he is litigating." *Id*. ¶ 47.  While in the RHU, he was only allowed in the law library once or twice a week for two hours. *Id*.  Most of the books were torn and outdated, and entire pages were missing. *Id*.  He did not receive any legal assistance. *Id*.  Sometimes he was not allowed in the

law library at all. *Id*.[1] In one instance on March 31, 2012, unnamed officers entered and searched Molina's cell "under [Bolton's] and [Kelly's] watch on J-Block," because he filed a mandamus petition in state court against Wenerowicz, Field, Kelly, and Bolton. *Id*. ¶ 21. The officers only checked Molina's "legal mail" and read it "piece by piece." *Id*. The plaintiff asked one of the officers why he was searching his cell and the officer replied, "[I]t's none of your business why I'm searching 'my' cell." *Id*. No other inmate's cell on the same block was searched that day. *Id*. According to the Confiscated Items Receipt attached to the Complaint, Corrections Officer R. Schneider confiscated an altered extension cord, an inmate request slip and an envelope from Molina's cell that day. *Id*., Exhibit A at 23.

The plaintiff also alleges that, on numerous occasions, Kelly and Ondrejka offered to release Molina into the general population if he became a "snitch, rat and/or jailhouse informant" against Latino inmates suspected of smuggling drugs and contraband into the facility. *Id*. ¶ 17. Molina refused their offers and remained confined in the RHU. *Id*. Lt. Radle also asked the plaintiff to inform on Latino inmates. *Id*. ¶ 46. When the plaintiff refused the offer, Lt. Radle issued his false misconduct report. *Id*. The other Defendants also engaged in retaliatory conduct based on the plaintiff's refusal to become a "jailhouse informant" for Lt. Radle and others. *Id*. ¶¶ 45, 53. As of the date of the Complaint, Molina had spent 14 months (420 days) in the RHU without any set date for his release. *Id*. ¶¶ 50, 54.

### B. Inhumane Conditions in the RHU

In addition to the allegations of discrimination and retaliation, Molina complains of inhumane conditions in the RHU. During his confinement, the plaintiff was subjected to "severe psychological abuse." *Id*. ¶ 49. He was housed with "mentally ill inmates who [threw]

---

[1] By contrast, inmates in the general population receive three law library passes per week for two hours a day and have "adequate and sufficient" books for legal research. *Id*. ¶ 47. They also receive legal assistance from law clerks and prison staff. *Id*.

6

feces and urine on inmates and staff members on a daily basis," and sometimes "in the exercise yards or showers." *Id*. Some of the mentally-ill inmates "[ate] their own feces and smear[ed] it on themselves or their cell walls" and other surfaces. *Id*. Molina was "forced to clean" the bodily waste "without the required and approved chemicals." *Id*. In that unsanitary environment, the plaintiff was permitted only three 15-minute showers per week. *Id*. ¶ 47. The showers lacked hot water and the stalls had rusty bars and mold. *Id*. And they were "constantly dirty" with gnats and other small insects, as well as rodent feces and urine, human feces, urine, and body hair, and sewage water. *Id*. "Molina [was] forced to take bird baths in his cell because the showers [were] so filthy." *Id*.

Molina experienced various other hardships while confined in the RHU. He was "subjected to loud noise constantly," such as "banging on the doors" and "kicking on the doors, windows, sinks, desks, bed bunks, lights and vents." *Id*. ¶ 49. He had "problems sleeping through all the loud noise," and "developed an anti-social and bipolar disorder." *Id*. He was only permitted one hour of outside recreation, five days per week. *Id*. ¶ 47. Sometimes his access to outside recreation was "denied by RHU staff" because he "challeng[ed] the unconstitutional conditions of confinement in the RHU against them." *Id*. "RHU staff" would tell him he had not signed up for yard time, even though he had. *Id*. Hot meals were served cold, and the food lacked necessary calories and nutrients. *Id*. Inmates only had five minutes to eat unhealthy food on "unsanitized" trays. *Id*. Molina was also denied "ALL" other privileges normally available to inmates in administrative custody, such as legal telephone calls, visitation, parole opportunities, commissary items, and access to vocational, educational and rehabilitative programs. *Id*. ¶ 48.[2]

---

[2] In contrast, inmates in the general population have a different experience. They are able to shower seven days a week for longer than 15 minutes per shower. The showers are clean and have hot water. Inmates in the general

Although the Complaint does not allege that any of the Defendants caused or were directly involved in subjecting the plaintiff to these conditions, it does state that Defendants "knew" of these conditions and "failed to act" or were "deliberately indifferent" to Molina's situation. *Id*. ¶ 52. Bolton, Kelly and Lt. Radle work in the RHU. *Id*. Wenerowicz "tours" the RHU and receives monthly reports from prison officials assigned to the RHU. *Id*. Canino conducts disciplinary hearings in the RHU, including hearings involving inmates who throw urine and feces at other inmates and staff. *Id*. Ondrejka also tours the RHU and conducts periodic reviews and administrative hearings in one of the wings where inmates throw urine and feces. *Id*. Field also tours the RHU and makes policy decisions regarding the conditions of confinement in that unit. *Id*. And, all Defendants knew Molina was filing grievances and taking legal action against them. *Id*. ¶ 53.

The plaintiff alleges he has used the prison's grievance system to try and resolve his problems. *Id*. ¶ 56. On September 20, 2012, the plaintiff wrote a letter to Secretary John Wetzel, Deputy Shirley Moore Smeal and Wenerowicz, claiming that he was being "threatened" with transfer and long term administrative segregation for "filing inmate grievances[,] complaints and civil actions challenging the conditions of confinements." *Id*. ¶ 16. Molina's concerns were not addressed to his satisfaction, and he filed this Complaint.

## DISCUSSION

The plaintiff's federal claims can be grouped into four categories: (1) unreasonable searches and seizures in violation of the Fourth Amendment; (2) equal protection and due process violations under the Fourteenth Amendment; (3) cruel and unusual punishment under the Eighth Amendment; and (4) retaliation and access-to-courts claims grounded in the

---

population are able to access outside recreation two to three times per day for up to two hours each time, seven days a week.  They are served nutritious meals with the approved amount of calories.  Meals are served hot and on clean trays by prison staff "wearing the approved dress code."  *Id*. ¶ 47.

First Amendment's right to petition the government for redress.  Compl. ¶¶ 57-63.  Defendants moved to dismiss only the claims for due process violations, cruel and unusual punishment, retaliation and access-to-courts.  Nevertheless, this Court addresses the Fourth Amendment and equal protection claims *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).  *See Martin v. Keitel*, 205 F. App'x 925, 927 (3d Cir. 2006).

### A. The Fourth Amendment Does Not Protect An Inmate's Cell or Property

The Complaint invokes the Fourth Amendment right to be free from unreasonable searches and seizures, but those protections do not apply to an inmate's prison cell or personal property.  *Crosby v. Piazza*, 465 F. App'x 168, 172 (3d Cir. 2012) (citing to *Hudson v. Palmer,* 468 U.S. 517 (1984) (personal property includes legal papers)).  Thus, to the extent the plaintiff is attempting to make a Fourth Amendment claim for arbitrary searches of his cell and the confiscation of his legal materials, that claim is denied as a matter of law.

### B. The Fourteenth Amendment Claims Are Dismissed

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."  U.S. Const. amend. XIV, § 1.  The Complaint alleges violations of both the equal protection and due process clauses.

#### 1. *The Complaint Does Not State an Equal Protection Claim*

To the extent the plaintiff is attempting to make a class-of-one equal protection claim based on "racial discrimination," *see* Compl. ¶ 57, that claim is dismissed.  To succeed on this theory, an inmate "must at a minimum allege that he was intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment."  *Barr v. Diguglielmo*, 348 F. App'x 769, 775 (3d Cir. 2009) (quoting *Phillips,* 515

F.3d at 243). According to Robinson's declaration, Kelly mocked the plaintiff for being Puerto Rican and speaking Spanish. *Id.*, Exhibit D-3 at 40. And, according to the Complaint, Kelly, Ondrejka and Lt. Radle tried to compel the plaintiff to "snitch" specifically on Latino inmates and then retaliated against him when he refused to do so. Compl. ¶¶ 17, 46. However, the Complaint does not allege Molina was pressured to "snitch" on Latino inmates on account of his race or ethnicity, or that such treatment was devoid of any rational basis. And Kelly's abusive statements alone, "no matter how deplorable," are not actionable under Section 1983. *Ayala v. Terhune*, 195 F. App'x 87, 92 (3d Cir. 2006).

### 2. *The Complaint Does Not Allege Deprivation of a Protected Interest*

The plaintiff's due process claim is also dismissed as a matter of law because he fails to allege deprivation of "a *protected* liberty or property interest" under the Fourteenth Amendment. *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1989) (emphasis added); *see also Diaz v. Canino*, 502 F. App'x 214, 217 (3d Cir. 2012) ("Without the presence of a protected interest, a § 1983 due process claim simply cannot stand."). A state prisoner's protected liberty interest "is limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *see also Sandin*, 515 U.S. at 484 (state-created liberty interests protected by the Fourteenth Amendment are "generally limited to freedom from restraint").

Relying on *Sandin*, the Third Circuit has consistently held that inmates do not have a protected liberty interest in avoiding confinement in the RHU, even for periods close to or longer than 14 months. *See, e.g., Diaz*, 502 F. App'x at 217 (360 days in SCI-Graterford's RHU under somewhat stressful conditions did not amount to deprivation of liberty interest); *Griffin*,

112 F.3d at 708 (no liberty interest in being free from 15 months in administrative custody). Nor do inmates have a protected property interest in their prison job. *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 171 (3d Cir. 2011). Thus, even if Molina's disciplinary hearing and subsequent reviews did not comport with federal due process, his confinement in the RHU and the termination of his prison job did not deprive him of a protected interest. Dismissal of plaintiff's due process claim, however, does not foreclose his First Amendment retaliation claim or his Eighth Amendment claim for inhumane conditions. *See Allah v. Seiverling*, 229 F. 3d 220, 223-24 (3rd Cir. 2000) (citing to *Sandin*, 515 U.S. at 487 n.11).

### C. Plaintiff States an Eighth Amendment Claim for Inhumane Conditions

Inadequate prison conditions do not violate the Eighth Amendment's proscription of "cruel and unusual punishment" unless they deprive the inmate of "the minimal civilized measure of life's necessities." *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). To be liable for an Eighth Amendment violation, a prison official must have acted or failed to act with "deliberate indifference" to an inmate's health or safety – "a standard that requires actual knowledge or awareness of the risk of the condition of confinement to the prisoner." *Ridgeway v. Guyton*, No. 15-1813, 2016 WL 6211884, at *1 (3d Cir. Oct. 25, 2016) (citing to *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)).

Defendants argue that the plaintiff fails to state an Eighth Amendment claim because he does not allege that any of the Defendants was personally involved in violating his rights. Defs.' Brief at 10, ECF No. 8. And, even if the Complaint shows Defendants were personally involved, none of the conditions alleged in and of itself violates the Eighth Amendment. *Id*. at 12-18. This Court disagrees and addresses each argument in turn.

11

1. *Defendants Acted with Deliberate Indifference*

Defendants acknowledge that "deliberate indifference" is an element of an Eighth Amendment claim, but argue that the plaintiff must also show they were personally involved in creating or overseeing the inhumane conditions. Defs.' Brief at 11. That is not the law.

Defendants rely primarily on *Evancho v. Fisher*, but that case dealt with whether Section 1983 liability can be predicated *solely* on respondeat superior without any involvement or knowledge on the part of the defendant. 423 F.3d 347, 353 (3d Cir. 2005). The court answered no, and held that Section 1983 requires a defendant's "personal involvement" in the wrongdoing. *Id*. The court further stated that "[p]ersonal involvement can be shown through allegations of personal direction *or of actual knowledge and acquiescence*." *Id.* (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988)) (emphasis added). Actual knowledge is an element of deliberate indifference. *See Beers-Capitol*, 256 F.3d at 131–32. Actual knowledge means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 131. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Molina claims that Defendants "knew" of the conditions in the RHU and were "deliberately indifferent" in their failure to respond. Compl. ¶ 52. Each of the Defendants either worked in the RHU, or regularly toured the facility and received information relating to the conditions there. *Id*. RHU staff and Wenerowicz were also aware that the plaintiff was challenging the constitutionality of his conditions of confinement. *Id*. ¶¶ 16, 47.[3] Furthermore,

---

[3] The Eight Amendment claim is subject to the exhaustion requirements under the Prison Litigation Reform Act. *Smith v. Mensinger*, 293 F.3d 641, 647 n.3 (3d Cir. 2002) (citing to *Booth v. Churner*, 532 U.S. 731, 741 (2001)). Exhaustion of administrative remedies is an affirmative defense. *Id*. Molina alleges he used the prison's grievance system to try and resolve his problems. *See, e.g.*, Compl. ¶¶ 16, 56. Defendants do not dispute that, and do not raise

the conditions alleged are so egregious that it is reasonable to infer that Defendants were aware of "the substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 837.

### 2. *The Totality of the Conditions Falls Below the Constitutional Minimum*

In addition to adequately alleging deliberate indifference, the Complaint alleges conditions that, in combination, amount to cruel and unusual punishment.

Defendants argue that none of the conditions alleged are unconstitutional when considered individually and, thus, there can be no Eighth Amendment violation. *See* Defs.' Brief at 12-18. This condition-by-condition analysis is incomplete, however, because courts "must look at the totality of the conditions within the institution." *Tillery*, 907 F.2d at 426 (citing to *Rhodes*, 452 U.S. at 347 (holding that conditions of confinement, "alone, *or in combination,* may deprive inmates of the minimal civilized measure of life's necessities.") (emphasis supplied)); *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (a combination of conditions violate the Eighth Amendment, even if each would not do so alone, "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need").

For instance, in *Tillery*, the Third Circuit noted that even though double-celling alone was not *per se* unconstitutional, it nevertheless amounted to cruel and unusual punishment when combined with multiple conditions that fell "below constitutional norms." 907 F.2d at 426-27. In making that determination, the court noted several "factors to be considered, including food, medical care, sanitation, control of vermin, lighting, heating, ventilation, noise level, bedding, furniture, education and rehabilitation programs, safety and security and staffing." *Id*. at 427. In that case, inmates were being confined in "unsanitary and dangerous" conditions. *Id*. at 423. The cells were infested with bugs, mice and other vermin, and the floors

---

exhaustion of remedies as a defense. Thus, to the extent the issue exists here, it is deemed waived. *See Smith*, 293 F.3d at 647.

were covered with animal feces and urine. *Id*. Plumbing was so bad that urine had accumulated on the floor and walls, "causing noxious odors." *Id*. Prison officials "fail[ed] to provide adequate cleaning supplies" for inmates to clean their own cells. *Id*. The showers were poorly maintained and inmates were only allowed three showers per week. *Id*. at 424. The conditions in the showers were so bad that some inmates resorted instead to taking "bird baths from the sinks in their cells" for security reasons. *Id*. (internal quotation marks omitted). Furthermore, prisoners were housed with mentally-ill inmates whose "frequent refusal to clean their cells exacerbated sanitation programs." *Id*. 423, 424. And, inmates had "limited opportunities for recreation outside their cells." *Id*. at 428. Experts concluded that keeping inmates under such conditions had "negative physical and psychological effects," including "stress, anxiety and depression." *Id*. at 424.

More recently, the Third Circuit vacated a district court's decision dismissing an Eighth Amendment claim for conditions substantially similar to the ones alleged in this Complaint. *See Allah v. Bartkowski*, 574 F. App'x 135, 139 (3d Cir. 2014). In *Bartkowski*, the plaintiff was placed in solitary confinement where he was allowed a 10-minute shower every day and a 90-minute yard period every second and third day. *Id*. at 138. The cell block reeked of "urine and excrement, and was infested with pests" due to the unsanitary conditions caused by mentally ill inmates who "did not clean themselves or their cells" and inmates who relieved themselves on the ground during the 90-minute yard period. *Id*. The court of appeals found that those unsanitary conditions "serve no legitimate penological objective." *Id*. at 139 (quoting *Farmer*, 511 U.S. at 833)) (alterations and internal quotation marks omitted). In addition, the plaintiff allegedly suffered sleep deprivation and headaches from being exposed to "mentally ill inmates who banged and kicked on the cell doors throughout the day" on a "consistent and

ongoing" basis. *Id*. at 138-39. In light of all the allegations, the court of appeals concluded "it was error to dismiss the [plaintiff's] Eighth Amendment claim for failure to state a claim." *Id*. at 139. *See also McKeithan v. Beard*, 322 F. App'x 194, 202 (3d Cir. 2009) (allegations that "psychotic inmates" threw feces and urine in the shower and at other inmates were "sufficiently serious" to state an Eighth Amendment claim).

In this case, Molina provides detailed and troubling allegations regarding the conditions of his confinement, which sufficiently approximate the unsanitary and stressful conditions found to be unconstitutional in *Tillery*, *Bartkowski* and *McKeithan*. For instance, even though restricting the number of showers to three times a week is not itself unconstitutional, this policy becomes problematic if the facility's walls and floors, including those in the defendant's cell, are covered in human feces thrown by mentally-ill inmates "on a daily basis," and the plaintiff is expected to clean his cell without proper supplies. Compl. ¶ 49. The situation becomes grimmer if the showers are so "constantly dirty" with bodily waste, vermin and other pollutants that the plaintiff is forced to take bird baths in his cell. *Id*. ¶ 47. Inadequate sanitation and poor hygiene seems to have also affected the cafeteria, where unhealthy meals are served on "unsanitized" trays and service staff may not be complying with the proper dress code. *Id*. *See Cook v. Corbett*, No. CIV.A. 14-5895, 2015 WL 4111692, at *8 (E.D. Pa. July 8, 2015) (rotten food served on dirty trays in SCI-Graterford's RHU was enough to state Eighth Amendment claim). On top of that, the Complaint sufficiently alleges that the plaintiff has been subjected to loud noise from inmates "constantly" banging and kicking on furniture and doors, causing him to suffer insomnia and serious mental distress. Compl. ¶ 49. Under such unsanitary and stressful conditions, restrictions on yard time and other privileges could plausibly compound the risk of harm to an inmate's mental and physical health even if those policies alone would not constitute

15

cruel and unusual punishment. In sum, the plaintiff has stated a plausible Eighth Amendment claim against all Defendants.

### D. The First Amendment Retaliation Claim May Proceed, But the Access-to-Courts Claim Is Denied

The plaintiff alleges two distinct but related claims based on a denial of his First Amendment right "to petition the Government for redress of grievances." U.S. Const. amend. I. The first claim is for retaliation based on the plaintiff's efforts to use the grievance system and access the courts and his refusal to inform on other inmates. The second claim is a distinct "access-to-courts" claim for the loss of a past legal claim.

#### 1. *The Complaint States a Retaliation Claim Based on the Plaintiff's Exercise of His Constitutional Rights to File Grievances and Civil Rights Complaints*

With respect to the retaliation claim, the plaintiff first alleges that Defendants conspired to use false misconduct reports to confine him in the RHU as retaliation for filing grievances and civil rights complaints against them. To make out a claim for retaliation, an inmate must plead "(1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (internal quotation marks and citation omitted) (brackets supplied).

Defendants concede that the Complaint satisfies the first and second requirements. Defs.' Brief at 22. The plaintiff's grievances and civil complaints with regards to his custody status are protected conduct. *See Mitchell*, 318 F.3d at 530 (filing grievances and complaints against defendants is protected); *Allah*, 229 F.3d at 225 (filing civil rights complaints is protected). And, the plaintiff's confinement in the RHU amounts to adverse action that would reasonably deter a prisoner of ordinary firmness. *See Mitchell*, 318 F.3d at 530.

As to the third requirement, Defendants argue that the plaintiff fails to establish a causal link between his exercise of the protected conduct and the alleged retaliation because the Complaint and the misconduct reports attached thereto show that Defendants had legitimate disciplinary and security reasons for confining the plaintiff in the RHU even in the absence of his grievances and lawsuits. Defs.' Brief at 22-23. Defendants ignore the fundamental allegation that undermines their argument: the misconduct reports upon which they rely to justify their decision to keep the plaintiff in the RHU are "false and fabricated." *See* Compl. ¶¶ 20-31, 46. The Third Circuit has "held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment guarantee of access to the courts." *Smith*, 293 F.3d at 653 (citing to *Milhouse v. Carlson*, 652 F.2d 371 (3d Cir. 1981)). *Milhouse* is on point because there, as here, the plaintiff alleged that he "was subjected to a conspiratorially planned series of disciplinary actions as retaliation for initiating a civil rights suit against prison officials." 652 F.2d at 373. The Third Circuit concluded, that if proved at trial, such allegations "would establish an infringement of Milhouse's first amendment right of access to the courts." *Id*. Thus, the plaintiff makes out a retaliation claim against all Defendants based on allegations that they retaliated against him for filing grievances and civil rights complaints against them.

The Complaint also alleges that Defendants retaliated against the plaintiff for his refusal to become a "jailhouse informant" and "snitch" against inmates suspected of smuggling drugs and contraband into the prison. Compl. ¶ 17. It is not clear whether Molina refused to participate in a sting operation or merely refused to cooperate in an internal investigation. *Compare Cooper v. Beard*, No. CIV.A. 06-0171, 2006 WL 3208783, at *12 (E.D. Pa. Nov. 2, 2006) (refusing to participate actively as an informant in a sting operation was protected activity) *with Walker v. Campbell*, No. CIV.A. 09-282, 2010 WL 2891488, at *7 (W.D. Pa. May 4, 2010)

17

(asking an inmate for help in an internal investigation is <u>not</u> unconstitutional), *report and recommendation adopted*, No. CIV.A. 09-282, 2010 WL 2884701 (W.D. Pa. July 20, 2010). Regardless of the scenario that applies, the Complaint does not allege a protected activity based merely on the plaintiff's refusal to "snitch" on other inmates.

### 2. *The Complaint Does Not State a Distinct Access-to-Courts Claim*

The plaintiff also attempts but fails to make out a separate access-to-courts claim.[4] To overcome dismissal of this claim, the plaintiff must allege that Defendants' conduct "cost him the opportunity to pursue a past legal claim." *Monroe v. Superintendent Coal Twp. SCI*, 597 F. App'x 109, 111 (3d Cir. 2015). Specifically, the plaintiff "must show (1) that [he] suffered an actual injury—that [he] lost a chance to pursue a nonfrivolous or arguable underlying claim and (2) that he has no remedy other than in the present denial of access suit." *Id.* (quoting *Monroe v. Beard,* 536 F.3d 198, 205 (3d Cir.2008)) (internal quotation marks omitted) (brackets supplied). The Complaint must plead the "underlying claim" in compliance with Fed. R. Civ. P. 8(a) and identify the "lost remedy." *Id*. The underlying claim must relate "to either a direct or collateral challenge to [the prisoner's] sentence or conditions of confinement." *Deen-Mitchell v. Lappin*, 514 F. App'x 81, 84 (3d Cir. 2013) (citing to *Lewis v. Casey,* 518 U.S. 343, 352–54 (1996)).

The plaintiff fails under both prongs. Attached to the Complaint is an inmate request in which Molina claims he withdrew his habeas petition from the Montgomery Courthouse because Kelly threatened to retaliate against him if he persisted.[5] Compl., Exhibit

---

[4] An access-to-courts claim may also be brought under the Fourteenth Amendment. *Monroe*, 536 F.3d at 205. Regardless of the constitutional basis, the analysis and outcome is the same. *See id*.

[5] Defendants acknowledge that the plaintiff filed a lawsuit, including a petition for writ of mandamus, in the Montgomery County Court of Common Pleas, and that plaintiff withdrew his mandamus petition on October 31, 2012. Defs.' Brief at 3-4.

D-3 at 41. The plaintiff also alleges that prison staff confiscated some of his legal materials. *Id*. ¶ 47. However, the Complaint does not specify the underlying claims or remedies lost as a result of those incidents. The fact that Molina has been able to litigate various claims at the state and federal level, including in the present case, further undercuts his access-to-courts claim. *See Ball v. Oden*, 425 F. App'x 88, 89 (3d Cir. 2011); *Crocamo v. Hudson Cty. Corr. Ctr.*, No. CIV.A.06-1441 (DMC), 2006 WL 1307665, at *6 (D.N.J. May 8, 2006).

## CONCLUSION

The equal protection and access-to-courts claims against all Defendants are dismissed with leave to amend the Complaint if the plaintiff so chooses. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 111 (3d Cir. 2002) (the plaintiff is entitled to amend his complaint "unless doing so would be inequitable or futile."). The claims for unreasonable searches and seizures and due process violations are also dismissed as a matter of law without leave to amend. *See id*. Defendants' Motion to Dismiss is denied with respect to the following claims against all Defendants: (1) an Eighth Amendment claim for deliberate indifference to the plaintiff's inhumane conditions of confinement, and (2) a First Amendment retaliation claim insofar as it is based on allegations that Defendants retaliated against the plaintiff for exercising his constitutional rights to file grievances and civil rights complaints against them. A corresponding order will issue forthwith.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. Darnell Jones, II    J.